## ASA BALDWIN
### *v.*
## WILLIAM S. DUNTON *et al.*

1. CONTRACTS—*of mental capacity to make a contract.* To establish such a want of mental capacity to make a contract as will require it to be canceled, there must be that degree of mental derangement, or imbecility of mind, that will induce the belief that the party seeking to avoid the contract on that ground, was incapable of fully comprehending the effect and consequences of his acts; or, at least, that he is so weak as to be almost a mere instrument in the hands of a person seeking to obtain an advantage.

2. On the contrary, if a person is capable of reasoning correctly on the ordinary affairs of life, or is capable of contemplating and understanding the consequences which usually accompany ordinary acts, he will be held *compos mentis,* and be bound by his acts.

3. FRAUD—*inadequate consideration.* In order to justify the setting aside of a conveyance of property on the ground that the purchaser, by exercising an undue influence upon the vendor obtained the property for an inadequate price, the consideration must be grossly inadequate.

APPEAL from the Circuit Court of Boone county; the Hon. T. D. MURPHY, Judge, presiding.

This was a bill in chancery, filed by the appellant against the appellees, in the Circuit Court of Boone county, on the 20th of January, 1864.

It is substantially alleged in the bill that, on the 4th of April, 1862, the complainant became involved in a difficulty which resulted in his arrest and confinement in the jail of De Kalb county; that, at the time of his arrest, he was possessed of a handsome property in Boone county, consisting of two farms—one of one hundred and seventy acres of land, the other of one hundred acres, together with certain personal property of great value. The lands were estimated to be worth $13,500; the personal property from $2,500 to $3,000; that, after the arrest of complainant, the defendants visited him in jail, and professed friendship and sympathy for him, and proffered their aid in his behalf; and that complainant supposed they were actuated solely by a desire to befriend him. The bill further alleged that complainant, at the time of his arrest, was nearly sixty years old, and had been for one or two years in feeble health; that his feebleness rapidly increased upon imprisonment, so much so that his life was despaired of by his friends, and that, upon their request, he was removed to the jail in Belvidere, June 10, 1862; that complainant had endeavored to be a man of integrity and good character, and that, so great was his sorrow and regret consequent upon his arrest and pending trial for murder, that he became much depressed in spirits and abstracted in mind, and, as his friends said, his general soundness of mind became so impaired as to make him wholly unfit and incapable of properly and understandingly attending to the transactions of business; that, during his enfeebled state of mind and body, the defendants came, unsolicited, and proffered their aid and assistance, and that one of the defendants, William S. Dunton, became a constant and daily visitor to complainant in jail, and spent much time there; that, during these visits, he had frequent conversations with him regarding his

case, in which the defendant, William S. Dunton, represented that he was constantly engaged in performing valuable services for complainant in looking up testimony and preparing his case for trial, and induced the complainant to believe that the services so being rendered were all-important to him, on which his life might depend, and that defendant frequently said that he would receive no compensation therefor—that it was a great pleasure to serve him; that the said defendant, William S. Dunton, during his visits to the complainant, made propositions to him for the purchase of his real estate and personal property, and that, on one occasion, he offered to pay complainant $8,000 for his entire property; that complainant refused to accept of the offer, and that thereupon the defendant's visits to complainant ceased; that, after several days' absence of defendant, the complainant sent for him, fearing that, in consequence of his refusal to accept of defendant's offer, he had become displeased and would abandon complainant and his case, leaving him entirely unprepared for trial; that the defendant, William S. Dunton, again called upon complainant, and that complainant then accepted of his proposition to sell all his real estate and personal property for the sum of $8,000, feeling that something must be done to restore friendship and obtain the assistance of the defendants; and that complainant and his wife thereupon executed a deed of his lands and a bill of sale of his personal property to said defendants.

That complainant was tried February 12, 1863, and acquitted, and returned home much broken down in mind and body. The bill further charges, that, during the negotiations for the sale of complainant's property, the defendant, William S. Dunton, told divers persons that complainant was not capable of transacting business, by reason of the shattered condition of his mind. That the defendant wrongfully took advantage of such state of mind of complainant, in procuring the said conveyances. The bill further alleges, that numerous accounts, notes and mortgages, were put into the hands of the defendant, George B. Dunton, for collection, and that he received therefrom about $3,200, but that he claims to have paid out for the

complainant therefrom about $3,050, and that William S. Dunton claims to have employed counsel for complainant, and incurred other expenses for him amounting to $923. The bill further states, that complainant at the time of his arrest was in easy circumstances, had owing to him more than he owed, and that the only incumbrance on his property, at the time of the conveyance to the defendants, was a mortgage, on which there was one about $1,800. Complainant charges that the sale and conveyance of his property to the defendants was unwillingly made, and from undue influence and coercive means practiced upon him by them, while imprisoned, and in a feeble state of mind and body, and prays for an accounting, and that the deed to defendant may be canceled, and the defendants decreed to reconvey all of the said property back to him, upon payment of such sum of money as may be equitable, and for general relief.

The answer of the defendants denies that the property conveyed to them was worth more than the sum paid for it, that they ever visited the complainant for the purposes charged in the bill, or offered to perform the services for him rendered by them, without fee, and avers that the said conveyances were made to them, without any wrong or fraud by them practiced upon complainant, or undue influence, or coercive means used, and that during all of their negotiations with the complainant, he was perfectly sane, clear and lucid in mind, and was not under, or controllable by any one, and that they never believed him insane or weak-minded.

The evidence in the case is fully discussed in the opinion of the court.

The court below took the case under advisement, and at the February Term, 1866, dismissed the bill. The complainant thereupon took this appeal.

Messrs. PLATO & SMITH, for the appellant.

Mr. SILVANUS WILCOX, for the appellees.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court :

In this case the evidence is by no means harmonious. And, as might be reasonably expected, when the mental condition of a person and the value of property are involved in the question, the difference of opinion amongst witnesses is distinct. On such questions it seems to be exceedingly difficult for different persons to see and estimate the facts and circumstances in the same light. Hence it is not unusual, on questions of sanity, to find intelligent and well-informed persons holding the opinion that the individual is sane, with ordinary mental vigor, while others suppose him to be capable of but the lowest mental effort, if not actually imbecile. And so as to the value of property, opinions range from a very high to the lowest price ever realized in the market. And usually such differences are honestly entertained, and based upon a conviction of their correctness.

In this case it is contended that appellant was mentally weak, and so far under the control of appellees, as to enable them to obtain valuable property from him at a great sacrifice in price. And that they took undue advantage of his situation while under prosecution for murder, to force from him property of large value for much less than its worth. Then was appellant insane, or was he mentally incapacitated to transact business to that extent that requires the sale to be canceled ? To produce that effect there must be that degree of mental derangement, or state of imbecility of mind, that induces the belief that the party is incapable of fully comprehending the effect and consequences of his acts, or, at least, that he is so weak as to be almost a mere instrument in the hands of the person seeking to obtain the advantage. On the contrary, if a person is capable of reasoning correctly on the ordinary affairs of life ; or is capable of contemplating and understanding the consequences which usually accompany ordinary acts, he will be held *compos mentis* and be bound by his acts.

In this case we are unable to find evidence in the record, that satisfies our minds, that appellant did not fully understand

the effect of this transaction at the time it was consummated. We think that the preponderance is largely in favor of his sanity. A large number of intelligent persons, who had the opportunity of observing his condition, seem never to have supposed that he was insane or incapable of transacting business. Amongst the number, were the sheriffs of the two counties, his jailers, his attorneys, and his intimate friends, all of whom frequently saw and conversed with him, and had his mind been deranged or impaired they would certainly have discovered the fact. And, although one of the appellees did speak of his mind as being affected, still the expressions were general and related rather to the future than to the time they were made. Many persons are known by their acquaintances to be unfit for the prosecution of some kinds of business, and still it would strike them with astonishment to hear it stated that such persons were insane or imbecile, to the extent that they were incapable of transacting ordinary business. It was rather in this light that the expressions of appellee should be understood, and not that he supposed appellant was insane or his mind unsound. We have no hesitation, from a careful examination of all the evidence in the case, in saying that appellant has failed to establish his insanity or mental weakness to a degree sufficient to avoid this sale.

Was there, then, such an undue influence exercised by appellees or either of them over appellant as amounts to a fraud, and requires the sale to be canceled? The testimony all shows that William Dunton manifested great friendship and a deep interest in the result of the prosecution against appellant, from its inception, until his acquittal, except for a few days, a short time before the trial. And we may infer from the facts of the case that it was not a friendship of a recent date, as appellant, from the time of his arrest, intrusted the settlement of his affairs to appellees, and relied upon them for advice and assistance, but particularly on William, in the preparation for his trial. If this manifestation of friendship was only for the purpose of obtaining an advantage, and to gain pecuniary benefit from the deep distress of appellant, we could scarcely conceive of any

thing more reprehensible. Such conduct would naturally excite the abhorrence of all honest men. But, on the contrary, if it was unselfish and disinterested, it manifested a trait of character which always has, and ever will command admiration and respect.

The evidence fails to disclose any thing from which it may be inferred, that either of the appellees said or did any thing for the purpose of inducing appellant to believe that their services in preparing for the trial, were important or necessary. On the contrary, when William ceased his visits to appellant, and was urged not to withdraw his assistance, he said that appellant's brother and son could prepare for trial as well as he could. Nor is it pretended that appellee professed to be able to accomplish any thing, or that he did less than they expected. The trial resulted in an acquittal, nor is there any complaint that he failed in any of his efforts in preparing for trial before or after the sale was consummated. While the evidence does not show a great deal that he did, still appellant's brother seemed to regard William's assistance as indispensable, and the family seemed to share in that opinion, and we discover no evidence that his services were unnecessary, or were unavailing. From all of this we do not discover any fraud, either actual or constructive, or that appellee did any thing to enhance the estimate of the value of his services.

It is urged, that William induced the belief that his services were indispensable, and then, to obtain an advantage of appellant and compel the sale on his own terms, withdrew his aid but a few days before the trial. He assigned as a reason for withdrawing his visits and assistance that appellant had lost confidence in him, and had refused to consummate a sale previously made by appellant to him. And it seems, that it required the highest solicitation of friends to induce him to return to his assistance. It is said however, that this was a part of his plan to coerce the sale. But we do not see the evidence of such a motive.

The fact that appellees purchased, of itself cannot prove the alleged fraud. It seems that it was generally known, that appel-

lant desired to sell the property, and so far from concealing the fact, it appears that appellees informed several persons that the property was for sale, who inquired of appellant his price and the terms. This by no means indicates that their purposes were fraudulent, or that appellees had formed the design of obtaining the property at a reduced price by unfair means. Designing men do not usually act in that manner, but rather conceal facts, and endeavor to prevent competition.

We are aware of no rule which prevents a friend, however intimate, from purchasing property of another; one friend or a relative has the unquestioned right to trade with another. And such considerations usually induce the giving a preference to a relative or friend rather than to a stranger, where a party is compelled to sell property at a bargain.

In this case, if appellant had determined to sell his property, nothing was more natural than that he would, at the same price and on the same terms, prefer selling to a friend to selling to a person toward whom he felt indifferent, and especially so when such a friend had been voluntarily rendering assistance considered valuable. And the evidence fails to disclose that any person was willing to give more than appellant received on this sale. No one offered more, although it was known the property was in market. And it appears, that, when, a short time after the trial, it was agreed that if appellant would give one thousand dollars appellee would reconvey, he was unable with all of his efforts to obtain an offer of more than he had received. After making the effort he declared that such was the fact.

In reference to the property, as is usually the case, opinions varied widely. Witnesses testified to the value of the land from thirty-five to one hundred dollars per acre. But a careful consideration of all of the evidence in the case induces us to believe it preponderates in favor of about forty dollars per acre for the home farm, which would be for the tract $6,800. As to the Beaver farm, the evidence varies from eight to fifteen dollars per acre. But if it were placed at twelve, and we think it preponderates in favor of that amount, or even lower, containing one hundred acres, its value would be $1,200. It how-

ever being subject to the life annuity of sixty dollars secured by a mortgage, we suppose, considering the age of the annuitant, it would detract one-third of its market value if unincumbered. This would, therefore, leave a net value of $800. And the wood-lot seems to have been worth $100. To this must be added the value of the personal property. and appellees, in their sworn answer, fix it at $1,578.58, which we think the evidence fails to show is too low. At these estimates, there would be an aggregate value of $9,278.65, and $1,278.65 more than the price paid.

It must be remembered, that the evidence was taken a considerable time after the transaction occurred, and the testimony shows that property in the mean time had risen considerably in price. And it is not easy for the fairest and most unprejudiced mind, after a length of time, to recall, with accuracy, former values of property, and this is especially true when there has been a large appreciation in prices. Under such circumstances it is difficult to fix the true value of property at an anterior date. But, making all due allowance, and carefully considering all of the evidence, we must conclude that the estimate we have adopted, is fully or more than as much as the property was worth at that time in the market.

Was the price, then, so inadequate as to call upon a court of equity to cancel the sale? We think it was not. To require a rescission the consideration must be grossly inadequate. But when we consider the magnitude of the sale, the little demand for such property at the time, the fact that appellant after a trial could obtain no more in the market after the sale was consummated, we are compelled to say the price was not grossly inadequate. That it may have been a bargain, which, in the hands of a successful trader, would afford a profit of from ten to fifteen per cent. on the investment, may be true; but our observation teaches us that property varies in value to that or a greater extent, in the hands of different persons. It is believed that real estate is not unfrequently sold at that much less than its value. We for these reasons are of the opinion that this decree should be affirmed.      *Decree affirmed.*

Mr. JUSTICE LAWRENCE, dissenting:

Although the appellee was not a professional attorney, the relations between him and the appellant were practically those of attorney and client.   He had made the appellant believe his services were necessary in preparing appellant's case for trial, in order to secure an acquittal.   He must therefore be held to prove that the purchase by him of appellant's property was made fairly and for a full consideration, and I cannot concur with my brethren in thinking he has done this.